UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WALTER GRIFFITH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 4:18-CV-01658 SEP |
| | ) |
| RICHARD JENNINGS, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Missouri state prisoner Walter Griffith's ("Petitioner") *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. [12]. For the following reasons, the petition will be denied.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Petitioner is an inmate at the Potosi Correctional Center in Mineral Point, Missouri. A jury convicted Petitioner of twenty counts involving the sexual abuse of a thirteen-year-old girl. Doc. [19] at 1. The Circuit Court of St. Louis City sentenced Petitioner as a prior and persistent offender to prison terms ranging from 5 to 25 years' incarceration for each count, most of which is to be served consecutively, for a total of over 300 years' imprisonment. *Id*.

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> Victim was thirteen years old when she first met Griffith.[1] Griffith was Victim's mother's boyfriend. At that time, Victim lived with her grandfather in a different house from where her mother and Griffith lived together. Victim visited her mother from time to time and saw Griffith when visiting. Victim also saw Griffith at her grandfather's house on several occasions. Griffith sexually abused Victim when she was thirteen and fourteen years old at both houses.
>
> When Victim first met Griffith, Griffith told Victim he had pancreatic cancer and that he was going to die soon. Subsequently, Griffith started sexually abusing Victim. Victim did not tell anyone about the abuse because she thought that it would end soon, due to Griffith's health condition. Griffith referred to Victim

---

[1] The Missouri Court of Appeals refers to Griffith as "Appellant" throughout its decision; for the sake of clarity, this Court has replaced all such Court of Appeals' references quoted throughout this opinion with "Griffith." Additionally, the Court has omitted footnotes that were included in the Court of Appeals's opinion, as they are not pertinent to this matter.

1

as his girlfriend. When Victim told Griffith that she was not his girlfriend, Griffith told her that he was going to kill himself, showing her a bandage on his wrist. Victim testified that this was personal to her because she herself used to self-harm and she thought that Griffith was aware of this fact. Victim felt very bad about Griffith threatening to kill himself and feared that he would follow through on his threat. For that reason, Victim no longer told Griffith she was not his girlfriend and the abuse continued.

When Victim was fourteen years old, she told her therapist about the sexual abuse because Griffith kept calling her, contacted her on Facebook, and was haunting her. At trial, Victim was the primary witness for the State and the sole witness to the sexual acts. The State elicited Victim's testimony by going through Griffith's offenses, location by location.

There were three incidents on the couch at Victim's mother's apartment:

*First Couch Incident*

Victim was lying on the couch in the living room when Griffith started massaging Victim's feet and moved his hands up her leg. Griffith asked Victim if she wanted to play a game where he would ask Victim north or south and his hand would go up or down, depending on her answer. Victim was so frightened that she did not respond. Griffith then touched Victim's thighs and started rubbing her vagina over her shorts and then under her shorts. Griffith then took off Victim's shorts and underwear, and kissed Victim's vagina.

*Second Couch Incident*

Victim was sleeping on the couch and Griffith took off her shorts and kissed Victim's vagina over her underwear. Griffith then removed Victim's underwear and kissed and licked her vagina. Victim told Griffith to stop, but he did not. Victim tried to push Griffith away, without success. Eventually, Griffith stopped.

*Third Couch Incident*

Victim was on the couch when Griffith pulled down Victim's shorts and underwear and tried to put his penis in Victim's vagina. Eventually, Griffith gave up and went back into the bedroom where Victim's mother was.

Two incidents occurred in the bedroom at Victim's mother's apartment:

*First Bedroom Incident*

Victim was lying on the bed when Griffith took off Victim's shorts and underwear. Griffith started kissing Victim's vagina and he told her that he was happy she was his girlfriend. Griffith then put his penis into Victim's vagina. Griffith stopped the act when Victim's mother came home.

*Second Bedroom Incident*

Victim was lying on her mother's bed when Griffith came in and pulled down her shorts and underwear. He touched Victim's vagina with his hand, rubbing the outside of her vagina and penetrating her vagina with his fingers. Griffith also kissed and licked Victim's vagina.

There were three incidents in the kitchen at Victim's mother's apartment:

*First Kitchen Incident*

Victim was standing in the kitchen when Griffith came up behind her and put his hand down Victim's pants and underwear and touched her vagina. Victim

2

told Griffith to stop, but he did not. In order to get away, Victim picked up a cup and told Griffith she had to take her mother a drink.

***Second Kitchen Incident***

Victim was sitting in the kitchen and Griffith came in and started rubbing Victim's vagina over her shorts. Griffith then moved aside Victim's shorts and underwear and directly rubbed her vagina with his hand. Victim told Griffith she was not his girlfriend. Griffith responded by acting sad, causing Victim to worry he would hurt himself.

***Third Kitchen Incident***

Victim was in the pantry and Griffith came in and closed the door. Griffith forced her down onto her knees and pushed his penis inside Victim's mouth. Griffith moved Victim's head back and forth until he ejaculated and kept his hand over her mouth until she swallowed.

There were two incidents in the bathroom at Victim's mother's apartment:

***First Bathroom Incident***

Victim was using the bathroom when Griffith came in and pulled Victim onto the floor. Griffith took Victim's hand and put it on his penis, making her hand stroke it.

***Second Bathroom Incident***

Victim was washing her hands when Griffith came in and told her to lie down on the floor. Griffith took off Victim's shorts and his pants, laid on top of her, and pushed her legs apart. Victim told Griffith to stop, but he did not. Griffith put his penis onto Victim's vagina but was unable to penetrate. After a few minutes, Victim was able to push Griffith off of her and left the bathroom.

There were also two incidents at the grandfather's house:

***First Incident***

Victim was sitting on the floor in her bedroom when Griffith came in and started touching her thigh. Griffith touched Victim's vagina over her shorts. After removing Victim's shorts and underwear, Griffith touched the outside of her vagina with his hand.

***Second Incident***

Victim and Griffith were playing cards in the kitchen when Griffith started rubbing Victim's thigh and rubbing "all over" her shorts and her vagina. He then touched her vagina with his hand.

Griffith did not call any witness, present any evidence, or testify himself. The jury found Griffith guilty as charged on all counts. The trial court sentenced him to a total of life plus 307 years' imprisonment.

Resp't. Ex. E at 2-6.

On direct appeal, Petitioner claimed that there was insufficient evidence to convict him on the charges of forcible sodomy, statutory sodomy, and forcible rape; that the verdict director posed a risk of a non-unanimous verdict; and that his conviction for both forcible rape and statutory rape violated his right against double jeopardy. Resp't. Ex. E. The Missouri Court of Appeals affirmed Petitioner's conviction in all respects. *Id.* Petitioner then filed a *pro se* Rule

3

29.15 motion for post-conviction relief, after which counsel was appointed for his state court post-conviction proceedings. Resp't. Ex. G. Petitioner's appointed counsel filed a timely amended Rule 29.15 motion seeking relief on grounds that (1) he was denied effective assistance of trial counsel because she failed to effectively cross-examine the victim; and (2) his appellate counsel was ineffective for failing to appeal the length of his sentence for Count XX. Resp't. Ex. G at 41-69. After an evidentiary hearing, the motion court denied Petitioner's claims of ineffective trial counsel but granted his claim as to the ineffectiveness of appellate counsel, finding that his sentence exceeded the statutory maximum on Count XX and competent appeals counsel should have argued the same. Resp't Ex. G at 92. The motion court vacated Griffith's invalid sentence and set his case for re-sentencing as to Count XX only. *Id*. Petitioner appealed the motion court's denial of his remaining claims for post-conviction relief, again alleging that his trial counsel was ineffective because she failed to effectively cross-examine the victim. Resp't Ex. J. The Missouri Court of Appeals affirmed the motion court's decision. *Id*.

      Petitioner then filed his *pro se* petition in the instant action. Doc. [12]. Petitioner raises ten claims for relief in his petition, asserting that: (1) his trial counsel was ineffective in failing to impeach the victim about her failure to report Griffith's abuse and about statements made to her mother encouraging her to allow Griffith to live with them; (2) there was insufficient evidence to show that he committed forcible sodomy by touching the victim's vagina, as charged in Count XI; (3) the charge of first-degree child molestation submitted in jury instruction number five failed to specify a date, time, or location, creating a risk of a non-unanimous jury verdict on that count; (4) his conviction for both statutory and forcible sodomy violates the Double Jeopardy Clause; (5) his conviction for both statutory and forcible rape violates the Double Jeopardy Clause; (6) his trial counsel was ineffective for failing to cross-examine the victim about her ability to recall the incidents of sexual abuse due to changes in her medications and the passage of time; (7) there was insufficient evidence to show that he committed rape through forcible compulsion, as charged in Count VII; (8) there was insufficient evidence to show that he committed rape through forcible compulsion, as charged in Count IX; (9) there was insufficient evidence to show that he committed forcible sodomy, as charged in Count XVI; and (10) there was insufficient evidence to show that he committed statutory sodomy, as charged in Count XII.

4

## II.     LEGAL STANDARDS

### A.  Standard for Reviewing Habeas Corpus Claims on the Merits

A federal judge may issue a writ of habeas corpus freeing a state prisoner if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The judge must not issue a writ, however, if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977).

"Federal habeas review exists as 'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). Accordingly, "[i]n the habeas setting, a federal court is bound by [the Antiterrorism and Effective Death Penalty Act (AEDPA)] to exercise only limited and deferential review of underlying state court decisions." *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003) (citing 28 U.S.C. § 2254). Under AEDPA, a federal court shall not grant relief to a state prisoner with respect to any claim that was adjudicated on the merits in the state court proceedings unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "[A] state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record." *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (citations and internal quotation marks omitted); *see also Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (noting that state court factual findings are presumed correct unless the habeas petitioner rebuts them through clear and convincing evidence (citing 28 U.S.C. § 2254(e)(1))).

5

### III.   DISCUSSION

#### A.  Insufficient Evidence Claims

Petitioner brings five claims regarding the sufficiency of the evidence, which the Court will address together.  In Grounds 2 and 10, Petitioner argues that there was insufficient evidence that he directly touched the victim's vagina to convict him of sodomy.  In Grounds 7, 8, and 9, Petitioner asserts that there was insufficient evidence that he used forcible compulsion to support his convictions for forcible sodomy and forcible rape.

For sufficient evidence to support a criminal conviction, the Fourteenth Amendment's Due Process clause requires "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  When a habeas petitioner challenges his conviction of a crime based on the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).  It is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 319); *see United States v. Whitlow*, 815 F.3d 430, 435 (8th Cir. 2016) (explaining that reviewing courts do "not reweigh the evidence or assess the credibility of witnesses" (citation omitted)).

Once a habeas petitioner "has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319.  "Under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655 (quoting *Jackson*, 433 U.S. at 324 n.16, internal citation omitted).  That Due Process inquiry is a narrow one where, as here, the jury "was convinced," because "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 656; *United States v. Manning*, 738 F.3d 937, 944–45 (8th Cir. 2014).

Further, when "the federal courts review a state-court ruling under the constraints imposed by AEDPA, the federal court must accord an additional and independent, high standard of deference." *White v. Wheeler*, 577 U.S. 73, 78 (2015) (quotation marks and citation omitted). Under that "twice-deferential" standard of review, a "state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quotation marks and citation omitted); *see also Coleman*, 566 U.S. at 651 ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."); *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015) (applying *Jackson*'s "narrow standard of review," explaining that, under AEDPA, a court "may grant relief only if [it] find[s] the [state court's] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard both incorrect and unreasonable," and rejecting a habeas challenge to the sufficiency of the evidence (quotation marks and citation omitted)).

In Grounds 2 and 10, Petitioner argues that the evidence presented at trial was insufficient to convict him of either statutory or forcible sodomy, as charged by the state in Counts XI and XII, both of which arose from the "first couch incident" during which Petitioner was accused of rubbing the victim's vagina over her shorts and then under her shorts. More specifically, Petitioner maintains that the state failed to prove that he touched the victim's vagina directly with his hand as opposed to through some of her clothing.[2] Petitioner also argues, in Grounds 7, 8, and 9, that there was insufficient evidence that he used forcible compulsion, as charged in Counts VII, IX, XI, and XVI, in which he was charged with forcible sodomy and forcible rape. Petitioner argues that his own threat of suicide did not constitute a threat against "another person" as required by the applicable Missouri statute, Mo. Rev. Stat. § 566.061(27)(b). Petitioner made these same arguments on direct appeal, and the Missouri Court of Appeals applied case law derived from *Jackson* and rejected his claims as follows:

> Griffith asserts that the evidence was insufficient to convict him of Count XI of forcible sodomy and Count XII of statutory sodomy because the State did not establish that Griffith engaged in deviate sexual intercourse with Victim. In

---

[2] Under the applicable Missouri sodomy statute, deviate sexual intercourse is defined as "any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person." *See* Mo. Rev. Stat. § 566.010(3). Therefore, the State had the burden of proving that Griffith touched the victim's vagina directly, rather than merely touching the clothing covering her vagina.

7

particular, he contends that the evidence was insufficient specifically because Victim did not testify to being touched on the skin of her vagina with Griffith's hand or any contact other than contact through the Victim's clothing, with Griffith's hand on the couch. Griffith argues that Victim's testimony that Griffith "started rubbing under [her] shorts" was not sufficient evidence of hand-to-genital contact to support his conviction for forcible sodomy or statutory sodomy. Griffith argues that Victim still had her underwear on when Griffith rubbed her vagina under her shorts and, accordingly, no skin-to-skin contact between Griffith's hand and Victim's vagina occurred. Griffith argues that touching Victim's vagina under her shorts was a sexual contact but not deviate sexual intercourse. We disagree. Testimony should not be read "in isolation," but should be "viewed as a whole and in context. Here, Victim described that Griffith rubbed her vagina over her shorts then stated "he started rubbing under my shorts." In describing another incident at Victim's grandfather's house, Victim similarly used the phrase, "under my shorts." There, Victim testified that Griffith rubbed her vagina all over her shorts then "started under my shorts." Victim later clarified that Griffith touched the outside of her vagina when he started rubbing her vagina under the clothing. Therefore, considering Victim's testimony in context, a reasonable jury could infer that Griffith touched Victim's vagina with his hand underneath her underwear when she stated "he started rubbing under my shorts." Because we must give great deference to the reasonable factual findings of a jury and do not weigh the evidence, disregarding all contrary inferences, we find that the evidence was sufficient for the jury to find that Griffith had deviate sexual intercourse with Victim on the couch, as charged in Counts XI and XII.

Griffith [also] asserts that the evidence was insufficient to convict him of Count XI of forcible sodomy, Count VII of forcible rape, Count IX of forcible rape, and Count XVI of forcible sodomy because the State did not establish that Griffith used forcible compulsion as charged in those counts. In particular, Griffith relies on two grounds. First, Griffith contends that Griffith's threat of suicide does not qualify as a threat to "another person" as defined under § 556.061(27)(b). Second, Griffith argues that it is unclear when the threat of suicide was actually made and if the threat came before or after any of the charged incidents. We disagree.

A common element of forcible rape and forcible sodomy is the use of "forcible compulsion." *See* §§ 566.030 and 566.060. Forcible compulsion is "either (a) physical force that overcomes reasonable resistance or (b) a threat, express or implied, that places a person in reasonable fear of death, serious physical injury or kidnapping of such person or another person." *See* § 556.061(27). In determining if the force used is sufficient to overcome reasonable resistance, the court does not look to any single fact but to the totality of the circumstances. Among the factors taken into account in considering the totality of the circumstances are whether violence or threats precede the sexual act; the relative ages of the victim and accused; the atmosphere and setting of the incident; the extent to which the accused was in a position of authority, domination, and control over the victim; and whether the victim was under

8

duress. In determining whether any force was used against Victim, we must give deference to the factual findings of the jury because the jury was in a better position not only to judge the credibility and demeanor of Victim and Griffith directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.

Furthermore, we find a comparable federal statute, 18 U.S.C. § 2241(a), analogous to our statute at issue, § 556.061(27). The federal statute provides that a sexual act is done "by force or threat" where the defendant "causes another person to engage in a sexual act . . . by threatening or placing that other person in fear that *any person* will be subject to death, serious bodily injury, or kidnapping . . . ." 18 U.S.C. § 2241(a) (emphasis added). In interpreting the statute, the Eighth Circuit in *United States v. Rojas* rejected the defendant's argument that his threat of suicide in coercing the victim in compliance and secrecy did not constitute a "threat" because the threat must be against someone other than the offender. 520 F.3d 876, 882 (8th Cir. 2008). The court held that "any person" is not inherently exclusive of the offender and accordingly could include the defendant himself such that a threat of suicide could satisfy the statute. *Id.* The court explained "[e]specially in the case of a child-victim, an offender's threat of suicide is a particularly heinous tool to coerce compliance and secrecy" and this kind of coercive conduct is precisely what the statute intends to target. *Id.* We find the Eighth Circuit Court's decision persuasive and apply the reasoning to this case because of the similarities in the language and construction of the federal statute and our statute. Therefore, we hold that Griffith's threat of suicide falls within the "threat" of death of "another person" under § 556.061(27).

Griffith argues, even if his threat of suicide falls within the definition of § 556.061(27), there is no indication he made routine threats of suicide. He further argues it is unclear if the threat of suicide came before or after any of the charged incidents. We find Griffith's arguments unpersuasive.

The State elicited Victim's testimony by the locations where the incidents occurred rather than in chronological order. When the State elicited Victim's testimony regarding incidents in the bedroom, Victim testified that Griffith called her his girlfriend. Victim then digressed from this testimony to discuss "one time" when Griffith threatened to kill himself, showing a bandage on his wrist, when Victim told him that she was not his girlfriend. Victim testified that ever since then, she did not tell Griffith that she was not his girlfriend because she was afraid that Griffith would kill himself. Griffith was aware that Victim was particularly vulnerable to this threat because Victim had a history of harming herself.

Because the jury knew that the Victim's testimony was elicited by the locations where the incidents occurred rather than by a timeline and because Victim described Griffith's threat of suicide as occurring at "one time" (as in the point of time before the incident in the bedroom), it was reasonable for the jury to find that the threat occurred sometime earlier than the bedroom incident Victim was describing. It was also reasonable for the jury to find that Victim was simply stating her motive for not resisting Griffith's acts, rather than

9

> describing a single, specific incident when Griffith threatened Victim with suicide. We must give deference to the jury's reasonable fact-finding and disregard all contrary evidence and inferences. Thus, we find the evidence was sufficient for the jury to find that Griffith used forcible compulsion by using the threat of suicide to coerce compliance in committing rape and sodomy against Victim, as charged in Counts VII, IX, XI, and XVI.

Resp't Ex. E at 7-11 (internal case citations omitted, cleaned up).

The Missouri Court of Appeals correctly applied the standard of review articulated in *Jackson*, and, upon review of the record, the Court finds that the factual findings cited by the state court are well-supported therein. The victim testified at trial that when she stated that Petitioner was rubbing "under her shorts," she meant that he was rubbing the outside of her vagina. Resp't Ex. A at 235-36. Furthermore, even if her testimony could give rise to conflicting inferences about whether Petitioner touched her vagina directly, under the doubly-deferential standard of review applicable under AEDPA, this Court must presume that the jury resolved any such ambiguity in the state's favor.

Additionally, the victim testified that after she told Petitioner she was not his girlfriend, he came to her with bandaged wrists and said he was going to kill himself, and after that time she was afraid that Petitioner would commit suicide if she told him she did not want the sexual abuse to continue.[3] *Id*. at 209. While it may have been somewhat difficult to discern at precisely what point in the chronology of events Petitioner threatened to kill himself, the testimony was such that it was reasonable for the jury to infer that the threat of suicide occurred before the charged acts. Further, it would have been reasonable for the jury to conclude that Petitioner's threat to kill himself was the victim's motive for not resisting his abuse, especially where such a threat would be particularly effective against this victim due to her own history of self-injury.

Viewing this evidence in the light most favorable to the prosecution, as the Court must, the undersigned concludes that the Court of Appeals' decision that there was sufficient evidence to support Petitioner's conviction for forcible and statutory rape and sodomy was not objectively

---

[3] The victim testified that she "hated it" when Petitioner would call her his girlfriend, but that she did not want to tell him she was not because "one time whenever I did he came to me and he had like a bandage on his wrists, you know, and he told me that he was going to kill himself. And I guess he knows that's kind of personal to me because I used to self-harm before . . . He knew that was more close and personal to me. He came in and had a bandage halfway up his forearm and he was—and he was acting like he was about to die. And I felt really bad. And ever since then, I didn't want to tell him that I'm not because I didn't want him to kill himself." Resp't Ex. A at 209.

unreasonable. This Court may overturn a jury's verdict only if the finding of guilt "was so insupportable as to fall below the threshold of bare rationality." *Johnson*, 566 U.S. at 656. That situation is clearly not presented in this case, and the finding of the Court of Appeals that sufficient evidence was presented at trial to support the verdict is entitled to deference. The Court will deny Petitioner's claims in Grounds 2, 7, 8, 9, and 10.

### B. Ineffective Assistance of Trial Counsel Claims

In Grounds 1 and 6, Petitioner argues that his trial counsel was ineffective in failing to cross-examine the victim on certain points. In Ground 1, Petitioner argues that trial counsel should have impeached the victim with her failure to immediately report the abuse to her mother and certain statements she made encouraging her mother to allow Petitioner to live with them. In Ground 6, Petitioner argues that trial counsel failed to adequately cross-examine the victim about her ability to recall the incidents of abuse in light of the passage of time and changes in her medication. Petitioner raised these claims in his post-conviction appeal, and the Missouri Court of Appeals denied them on their merits. Resp't. Ex. J at 5-6. As furthered explained below, this Court's review of the record shows that the Missouri court's resolution of Petitioner's ineffective assistance claims reflects a reasonable application of federal law and is thus entitled to deference.

The Sixth Amendment guarantees a criminal the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To show ineffective assistance of counsel, Petitioner must show both that "[his] counsel's performance was deficient" and that "the deficient performance prejudiced [his] defense." *Id.* at 687; *see also Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014); *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011). To show deficient performance, Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [Petitioner] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential," and Petitioner bears a heavy burden in overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). To show prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

11

When an ineffective assistance claim has been addressed by the state court, this Court must bear in mind that, "[t]aken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 202 (2011)). In the context of a habeas claim, it is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699. "This standard was meant to be difficult to meet, and 'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" *Williams*, 695 F.3d at 831 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "If the state court reasonably could have concluded that [the petitioner] was not prejudiced by counsel's actions, then federal review under AEDPA is at an end." *Id*. at 832 (internal quotation marks omitted).

Petitioner was granted a post-conviction evidentiary hearing, at which his trial counsel testified at length about her decision to avoid cross-examining the victim about why she did not immediately report the abuse to her mother and why the victim encouraged her mother to allow Petitioner to return and live with them after he had moved out. Petitioner's attorney explained why it was her strategic decision to avoid this line of questioning:

> [The victim] said her mother was depressed because [Mr. Griffith] left, and she's telling you [in this deposition] that she just wanted her mother to be happy because her mother was sick . . . At trial [the victim] basically was telling the jurors she didn't want her mother to die and that she tried to commit suicide herself and that she was depressed, but she thought that Mr. Griffith had cancer . . . I wasn't going to browbeat her about "why didn't you tell your mother." . . . She was already crying. She was a cutter, and she—that was not—information that we did not need in the trial. . . . I cross-examined her about how any of that could have happened in such a small apartment. I wasn't going to start asking her about-well, the one thing I did not want was for the fact that her mother being that ill, for that information to come out and for her to start crying on the stand, which she already had . . . what I'm saying is . . . she felt sorry for [Mr. Griffith] and wanted him to come back because she wanted her mother to be happy at her expense, basically . . . She basically said that her mother was depressed, and she just wanted her mother to be happy . . . There weren't any prior denials. . . . Her saying . . . "I didn't tell my mom early on" . . . she did tell her later.

Resp't Ex. F at 10-12.

12

The motion court found Petitioner's attorney to be "an extremely credible witness" and her strategic trial decisions to have been reasonable.  The Missouri Court of Appeals, applying the *Strickland* standard, agreed with the motion court and denied Petitioner's claim that his defense counsel was constitutionally deficient in failing to pursue this line of cross-examination. Resp't. Ex. J at 4.  On consideration of the testimony of Petitioner's trial counsel, the Court of Appeals agreed that her strategy was reasonable and that nothing about her performance was deficient, stating that "we find no error in the court's assessment of counsel's performance here. Moreover, as Griffith acknowledges, Child's initial non-disclosure was raised during direct examination and thus was already before the jury; so we see no reasonable probability that counsel's decision affected the outcome." *Id*.

As for Petitioner's contention that his counsel should have elicited information about the victim's ability to recall the incidents in light of the passage of time and her prescribed medications, the Missouri Court of Appeals again applied *Strickland* and also denied that claim:

> The extent and manner of cross-examination is a matter of trial strategy. Reasonable choices of trial strategy, no matter how ill-fated in hindsight, cannot serve as a basis for a claim of ineffective assistance.  Rarely will counsel be deemed ineffective for failure to go far enough in cross-examining a witness. After considering all circumstances, counsel may fairly determine that the use of certain impeachment evidence may cause her client more harm than benefit. At the hearing on Griffith's motion, counsel explained:
> A:   She [the victim] gave them detailed sex acts in the pantry of the kitchen and the bed and living room, so why would I even ask about the medicine when those details that she gave in the deposition—I mean she still gave details.
> Q:   So, highlighting the fact that her memory was even better a little bit ago would not have been helpful?
> A:   Right.
> The motion court found that counsel was credible and exercised reasonable trial strategy.  We find no error on this record.  To overcome the presumption that defense counsel exercised a reasonable trial strategy in deciding not to impeach a witness, a movant must demonstrate that the decision was not a matter of reasonable trial strategy and that the impeachment would have provided him with a defense or would have changed the outcome of the trial.  Counsel's strategy was reasonable insofar as she sought to avoid an inference that Child's memory was actually quite clear on multiple incidents.  We see no probability of a different outcome had counsel explored this issue further.

Resp't. Ex. J at 4-5 (internal citations omitted) (cleaned up).

This Court must indulge a "strong presumption" that defense counsel's conduct fell within the range of reasonable representation. *Strickland*, 466 U.S. at 689.  After reviewing the

13

relevant portions of the record with that standard in mind, the undersigned finds that it contains ample support for the conclusions of the Missouri Court of Appeals. Counsel's decisions to avoid the contested lines of questioning were reasonable. With respect to how and when the victim communicated the abuse incidents to her mother, counsel made the logical determination that pursuing this line of questioning could elicit testimony about the mother's illness, which could have made the victim even more sympathetic to the jury. And testimony that the victim had tolerated sexual abuse in order to avoid worsening her mother's depression could also have damaged Petitioner's defense.

Petitioner has not shown that his attorney's performance was deficient, nor that the outcome of his case would have been affected in any meaningful way if counsel had pursued these topics on cross-examination. On this record, the Court cannot say that the Missouri court applied either the performance or the prejudice prong of *Strickland* unreasonably; nor was its decision an "unreasonable determination of the facts in light of the evidence presented in state court." *Cole v. Roper*, F.3d 1183, 1187 (8th Cir. 2010); 28 U.S.C. § 2254(d). Accordingly, the Court will deny habeas relief on Petitioner's claims in Grounds 1 and 6.

### C.  Double Jeopardy Claims

In Grounds 4 and 5, Petitioner asserts that he was placed in double jeopardy when he was convicted and sentenced for both forcible and statutory rape and forcible and statutory sodomy. The Fifth Amendment's Double Jeopardy Clause protects a criminal defendant against cumulative punishment. *See Dodge v. Robinson*, 625 F.3d 1014, 1017 (8th Cir. 2010) (discussing "three protections" under double jeopardy clause, including protection against cumulative punishment). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). No double jeopardy violation occurs "[w]here...a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct." *Id*. at 368-69.

Petitioner was convicted of multiple counts of both statutory and forcible rape, as well as statutory and forcible sodomy, and he asserts that because the same acts underlie both the rape convictions and the sodomy convictions, his right to be free of double jeopardy has been violated. Unfortunately for Petitioner, the United States Supreme Court has rejected the "same

14

conduct" analysis of double jeopardy claims. *See United States v. Dixon*, 509 U.S. 688, 703-04 (1993). It is permissible for a defendant to be convicted and sentenced for multiple offenses based on the same conduct, provided that the legislature intended separate punishment for the offenses. *Id*. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Dodge*, 625 F.3d at 1018 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also United States v. Gamboa*, 439 F.3d 796, 809 (8th Cir. 2006) ("Under *Blockburger*, if each offense requires proof of an element not required by the other, the crimes are not considered the same, and a double jeopardy challenge necessarily fails.") (quotation marks omitted).

Petitioner brought these claims on direct appeal, and the Missouri Court of Appeals addressed them. Applying *Blockburger*, that court denied Petitioner's claims because statutory and forcible sex offenses are not the same offense, as each requires proof of an element that the other does not. Each statute requires proof of a separate fact not required by the others: forcible rape and forcible sodomy require proof of forcible compulsion, whereas statutory rape and statutory sodomy require proof that the victim was less than 17 years of age and that Petitioner was twenty-one years of age or older. *See* Mo. Rev. Stat. §§ 566.030.1; 566.064.1. Therefore, the Missouri Court of Appeals concluded that under *Blockburger*, Petitioner's convictions for both sets of offenses did not violate the Double Jeopardy Clause.

The Court agrees that Petitioner was not subjected to double jeopardy under the circumstances presented here. For the reasons stated above, the state court's adjudication of the statutory and forcible rape and sodomy claims was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Accordingly, Grounds 4 and 5 will be denied.

### D. Unanimous Jury Claim

Finally, Petitioner argues in Ground 3 that jury instruction number five, which instructed the jury regarding the first-degree child molestation charged in Count I, failed to ensure that the jury unanimously convicted Griffith for one certain instance of conduct. Because the instruction did not specify a date, time, and location, Petitioner claims that it could have referred to any of the multiple similar instances of molestation that were described during trial.

15

Respondent argues that Ground 3 does not state a cognizable claim for federal habeas relief, as there is no federal constitutional requirement that state criminal juries must reach a unanimous verdict, and this Court may only grant relief for claims that a state prisoner's conviction violates the United States Constitution or federal law. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."); *Shigemura v. Moore*, 2007 WL 2736306, at *4 (E.D. Mo. Sept. 17, 2017) (Issues regarding the interpretation and application of state law are non-cognizable in a federal habeas petition.). And Respondent's argument was an accurate statement of the applicable law at the time of Petitioner's conviction as well as when he filed his federal petition for habeas relief. But the law has since changed significantly in this area, and the Court must determine whether that change affects Petitioner's rights with respect to habeas relief.

While Griffith's petition for habeas relief was pending, the United States Supreme Court held in *Ramos* v. *Louisiana*, 140 S. Ct. 1390 (2020), that the Fourteenth Amendment incorporates the Sixth Amendment right to a unanimous jury against the States, and therefore a state jury must be unanimous to convict a criminal defendant of a serious offense. *Ramos* overturned the Supreme Court's 1972 decision in *Apodaca v. Oregon*, 406 U.S. 404, which had allowed non-unanimous juries in state criminal trials. The question before this Court, then, is whether the new rule of criminal procedure announced in *Ramos* may apply retroactively to final convictions on federal collateral review.

Ordinarily, a new rule of criminal procedure will not apply retroactively to overturn final convictions on federal collateral review. *See Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion); *Penry v. Lynaugh*, 492 U.S. 302, 313–314 (1989). That is because applying "constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." *Id.* at 309. Notwithstanding that presumption, the Supreme Court has stated that a new procedural rule may apply retroactively on federal collateral review if it constitutes a "watershed" rule of criminal procedure. *Id.* at 311. In its most recent term, the Supreme Court considered whether

16

the new rule in *Ramos* applies retroactively on federal collateral review, and it determined not only that it does not, but also that the "watershed exception is moribund"; going forward, new rules of criminal procedure will never apply retroactively on federal collateral review. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1554-56 (2021). In light of the Supreme Court's decision in *Edwards*, Petitioner's Ground 3 does not state a cognizable claim, and the Court will therefore deny habeas relief on that ground.

## IV.  CONCLUSION

For the foregoing reasons, Petitioner is not entitled to federal habeas relief. Under 28 U.S.C. § 2253(c)(1)(A), an appeal may not be taken from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit judge or district judge issues a certificate of appealability. To grant such a certificate, the judge must find that the petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2); *Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (citation omitted). Here, reasonable jurists could not differ on Petitioner's claim; therefore, the Court will not issue a certificate of appealability.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

**IT IS FINALLY ORDERED** that no certificate of appealability shall issue. 28 U.S.C. § 2253.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 21st day of July, 2021.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE